IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN DIVISION

MELODY KING,

        Plaintiff,

vs.

ALLEN MEMORIAL HOSPITAL
CORPORATION, d/b/a ALLEN
MEMORIAL HOSPITAL, ALLEN
HEALTH SYSTEMS, and IOWA
HEALTH SYSTEMS,

        Defendants.

No. C11-2058

RULING ON MOTION FOR
SUMMARY JUDGMENT

## TABLE OF CONTENTS

I.    *INTRODUCTION* ......................................... 2

II.   *PROCEDURAL BACKGROUND* ........................... 2

III.  *RELEVANT FACTS* ..................................... 3

IV.  *LEGAL STANDARD FOR SUMMARY JUDGMENT* ........ 7

V.   *DISCUSSION* ........................................... 8
      A.   *Title VII and Iowa Code Chapter 216* .................. 8
      B.   *Surviving Summary Judgment in a Title VII Discrimination
          Claim* ............................................. 9
      C.   *Theories of Discrimination under Title VII* ............. 9
      D.   *Sex Discrimination* ................................. 10
          1.    *Disparate Treatment* ......................... 10
              a.   *King's Prima Facie Case* ................. 10
              b.   *AMHC's Legitimate Non-Discriminatory Reason* .... 15
              c.   *Pretext* ................................ 15
          2.    *Disparate Impact* ............................ 19

VI.  *CONCLUSION* ........................................ 21

VII. *ORDER* ............................................. 22

## I. INTRODUCTION

This matter comes before the Court on the Corrected Motion for Summary Judgment (docket number 21) filed by Defendants Allen Memorial Hospital Corporation, d/b/a Allen Memorial Hospital, Allen Health Systems, and Iowa Health Systems, on November 21, 2012; the Resistance (docket number 22) filed by Plaintiff Melody King on November 21, 2012; and the Reply (docket number 23) filed by Defendants on December 3, 2012.[1] Pursuant to Local Rule 7.c, the Motion for Summary Judgment will be decided without oral argument.

## II. PROCEDURAL BACKGROUND

Plaintiff Melody King ("King") timely filed charges of sex discrimination in employment against Defendants Allen Memorial Hospital Corporation, d/b/a Allen Memorial Hospital ("AMHC"), Allen Health Systems, and Iowa Health Systems with the Iowa Civil Rights Commission ("ICRC") and Equal Employment Opportunity Commission ("EEOC").[2] On July 28, 2011, the ICRC issued an Administrative Release (right-to-sue

---

[1] Defendants did not seek leave of the Court to file their "Corrected" motion for summary judgment. However, in a letter to the Court, which was also provided to Plaintiff's counsel, Defendants explain that the only changes made in the "Corrected" motion for summary from the original motion for summary judgment, include changing the word "seven" to "six" in one paragraph of the motion for summary judgment, one paragraph in the Statement of Undisputed Material Facts, and on 3 separate pages in the Brief in Support of the Motion for Summary Judgment. It appears that these are not substantive changes, and Plaintiff appears not to object to the "Corrected" motion for summary judgment. Accordingly, the Court will proceed with the "Corrected" motion.

[2] In their brief, Defendants Allen Health Systems and Iowa Health Systems, argue that they should be dismissed from this matter because they are separate entities from AMHC, and did not employ King. *See* Defendants' Corrected Memorandum of Law in Support of Their Motion for Summary Judgment (docket number 21-3) at 13-14. King agrees with Defendants and "does not dispute that Allen Memorial Hospital Corporation was her employer and that her claims of discrimination should proceed solely against Allen Memorial Hospital Corporation." King's Brief in Support of Her Resistance to Defendants' Motion for Summary Judgment (docket number 22-3) at 12. Accordingly, the Court determines that Defendants Allen Health Systems and Iowa Health Systems should
(continued...)

letter) to King with respect to her charge of sex discrimination. On August 26, 2011, the EEOC also issued King a Notice of Right to Sue.

On September 29, 2011, King filed a Complaint and Jury Demand. *See* docket number 2. The following day, on September 30, King filed an Amended Complaint and Jury Demand (docket number 4) alleging sex discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. and the Iowa Civil Rights Act, Iowa Code Chapter 216. *See* Amended Complaint and Jury Demand (docket number 4) at 3; ¶ 11. On October 27, 2011, Defendants filed an Answer (docket number 6), generally denying the material allegations contained in the amended complaint, and asserting certain affirmative defenses. On January 30, 2012, both parties consented to proceed before a United States Magistrate Judge, pursuant to 28 U.S.C. § 636(c). Trial is scheduled before the undersigned on March 11, 2013.

### III. RELEVANT FACTS

AMHC is a hospital offering healthcare services in Waterloo, Iowa. King began employment at AMHC on September 13, 2004, working as a Certified Nursing Assistant ("CNA") in the Skilled Nursing Department. King also worked as a Unit Coordinator in the Skilled Nursing Department. On April 25, 2005, King transferred to the Emergency Department. Initially, she worked as an Acute Care Coordinator in the Emergency Department. Her job duties included answering phones, entering physicians' orders, and scanning and faxing documents. Later, King also started performing CNA duties as a "Critical Care Tech" in the Emergency Department.[3] From that time forward, King simultaneously held the positions of Acute Care Coordinator and Critical Care Tech.

---

[2](...continued)
be dismissed from this action.

[3] Individuals employed as Critical Care Techs included CNAs, nursing students, Licensed Practical Nurses, and Emergency Medical Technicians. The position involved assisting Registered Nurses with hands-on patient care.

In November 2009, AMHC determined that a reduction-in-force and restructuring of the Emergency Department was necessary. Specifically, Mike Tiedt, the Emergency Room Director, was instructed to reduce the number of full-time equivalent ("FTE") employees in the Emergency Department from 50 FTEs to 43 FTEs. In restructuring the Emergency Department, Tiedt determined that Registered Nurses needed to be retained in order to meet patient needs. Tiedt concluded that the number of Acute Care Coordinators could be reduced from 10 to 7, with preference being given to employees in that position with the most hospital seniority. Lastly, Tiedt eliminated the Critical Care Tech position and replaced it with a position entitled "Critical Care Safety Tech." All individuals in the Critical Care Tech position were displaced and informed that they could apply for the Critical Care Safety Tech position, if they met the qualifications for the new position.

Two new qualifications were added to the Critical Care Safety Tech position that had not been required for the Critical Care Tech position. The two new qualifications required Critical Care Safety Techs (1) to possess a basic Emergency Medical Technician ("EMT") certification, and (2) pass a physical agility test specifically developed for the position. Tiedt implemented the EMT requirement to ensure patient needs were satisfied, and developed the physical agility test because he had observed a rise in violence in the Emergency Department. In his deposition testimony, Tiedt stated:

> Q:    Okay. You mentioned a surge of violence. What do you mean by that?
> A:    We had noticed a dramatic increase in the number of behavioral health patients presenting to the emergency department. What we had noticed is that with the State moving towards limiting inpatient psychiatric beds, care of psychiatric patients was moving to an outpatient setting, and with compliance based upon the mental illnesses, it was challenging for them, and we'd seen that they had become noncompliant with their medications out in the real world and their behaviors would escalate and then they'd re-present themselves to the emergency department.

AMHC's Appendix (docket number 21-7) at 37; Tiedt's Deposition at 83:23-84:11.

At a meeting in 2009, King and other Emergency Department employees were informed by Tiedt that the department would be restructured and the Critical Care Tech position would be eliminated and replaced with the Critical Care Safety Tech position. The employees were told that the Critical Care Safety Tech position would be similar to the Critical Care Tech position, with two additional qualifications, EMT certification and the ability to pass an agility test. Tiedt stated that the new position requirements were because he wanted the "bouncer type" in the Critical Care Safety Tech position.[4] According to King, after Tiedt provided this information, he looked at the female Critical Care Techs and said, "I'm sorry."[5] Additionally, all Critical Care Techs, both male and female, who wanted to become Critical Care Safety Techs, were required to apply and interview for the new position, assuming they met the requisite qualifications.

Tiedt was the ultimate decision-maker with respect to the individuals hired for the Critical Care Safety Tech position. Six individuals were hired into the position, including two women. King did not apply for the Critical Care Safety Tech position because she

---

[4] In his deposition, Tiedt stated that by "bouncer type," he meant a "general person," male or female, "that can go in, that could provide direct physical contact to prevent harm or self destruction." AMHC's Appendix (docket number 21-7) at 41; Tiedt's Deposition at 98:14-18.

[5] AMHC's Appendix (docket number 21-6) at 15; King's Deposition at 110:23-111:5 ("[Tiedt] told us that they were going to restructure the ER and our positions would be changing and the techs -- he said that to be a tech, it's going to have new requirements. We'd have to go through a physical agility test and you had to be an EMT, because he wanted the bouncer type. He looked at the female techs and he said 'I'm sorry.[']"). AMHC denies that Tiedt told female Critical Care Techs "I'm sorry," but argues that in any event, such a statement is "not relevant to any issue before this Court on Defendants' Motion for Summary Judgment." AMHC's Response to Plaintiff's Statement of Additional Material Facts in Response to Defendant's Motion for Summary Judgment (docket number 24) at 6-7; ¶ 6.

was not a certified EMT.[6]  In her deposition, King further elaborated on her reasons for not seeking the Critical Care Safety Tech position:

> Q:  Did Mike Tiedt or anybody else explain in that meeting why the critical care techs that had their EMT certification would need to reapply for a job?
>
> A:  Because there were new lifting requirements and he wanted the bouncer type.
>
> Q:  Did he ever say in the course of that meeting that women need not apply for the new --
>
> A:  No.
>
> Q:  -- critical care tech job?  Did he say anything at all in that meeting that led you to believe that the newly created position of critical care safety tech was not available to women?
>
> A:  Yeah.
>
> Q:  And what did he say that led you to that conclusion?
>
> A:  That they had to have an EMT, which is a predominantly male profession, and that he wanted the bouncer type. . . .
>
> Q:  My question is, with regard to the EMT requirement, is there anything else besides the fact that you believe the EMT profession is predominantly male that led you to believe that that requirement meant women need not apply?
>
> A:  Well, the EMT position is predominantly male, and LPNs have more education than EMTs, and the LPN position is predominantly female.  So that would lead me to believe that he only wants men to apply for these jobs.
>
> Q:  Is there anything you're aware of that makes it impossible or impracticable for a woman to obtain the EMT designation?
>
> A:  No. . . .
>
> Q:  So, again, my question is, what about him using the phrase bouncer type led you to believe that women need not apply for the position of critical care safety tech?

---

[6] King also did not apply for the Acute Care Coordinator position because she did not believe that she had enough seniority to get the position on a full-time basis during a shift she was available to work.

A:    'Cause I've never met a woman bouncer.

Q:    Anything else?

A:    In life, when people talk about the bouncer type, they are referring to men.

AMHC's Appendix (docket number 21-6) at 16-17; King's Deposition at 115:16-118:10. Ultimately, King elected to resign her employment with AMHC. King's at-will employment was terminated effective December 24, 2009. Other facts that are significant for making a determination on AMHC's Motion for Summary Judgment will be discussed, as necessary, in the Court's consideration of the legal issues presented.

## IV. LEGAL STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate if the moving party shows that "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(a). A genuine dispute as to a material fact "'exists if a reasonable jury could return a verdict for the party opposing the motion.'" *Anderson v. Durham D & M, L.L.C.*, 606 F.3d 513, 518 (8th Cir. 2010) (quoting *Humphries v. Pulaski County Special School District*, 580 F.3d 688, 692 (8th Cir. 2009)). A fact is a "material fact" when it "might affect the outcome of the suit under the governing law. . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In order to establish the existence of a genuine dispute as to a material fact, the non-moving party "'may not merely point to unsupported self-serving allegations.'" *Anda v. Wickes Furniture Co.*, 517 F.3d 526, 531 (8th Cir. 2008) (quoting *Bass v. SBC Communications, Inc.*, 418 F.3d 870, 872 (8th Cir. 2005)). Instead, the non-moving party "'must substantiate [its] allegations with sufficient probative evidence that would permit a finding in [its] favor.'" *Anda*, 517 F.3d at 531 (quoting *Bass*, 418 F.3d at 873); *see also Anderson*, 477 U.S. at 248 (A nonmoving party must offer proof "such that a reasonable jury could return a verdict for the nonmoving party."). "'Evidence, not contentions, avoids summary judgment.'" *Reasonover v. St. Louis County, Mo.*, 447 F.3d 569, 578 (8th Cir. 2006) (quoting *Mayer v. Nextel W. Corp.*, 318 F.3d 803, 809 (8th Cir. 2003)). The court must view the record in the light most favorable to the nonmoving party

and afford it all reasonable inferences. *Baer Gallery, Inc. v. Citizen's Scholarship Foundation of America, Inc.*, 450 F.3d 816, 820 (8th Cir. 2006) (citing *Drake ex rel. Cotton v. Koss*, 445 F.3d 1038, 1042 (8th Cir. 2006)).

## V. DISCUSSION

### A. Title VII and Iowa Code Chapter 216

Title VII prohibits employers from discriminating against any individual based on sex with respect to compensation, terms, conditions, or privileges of employment. 42 U.S.C. § 2000e-2(a)(1). Similarly, Iowa Code section 216.6(1)(a) makes it an unfair or discriminatory practice for any person "to discharge any employee, or to otherwise discriminate in employment against . . . any employee because of the . . . sex . . . of such . . . employee[.]" *Id.* King's sex discrimination claim, whether brought under Title VII or the ICRA, is analyzed under the same framework. *See Vivian v. Madison*, 601 N.W.2d 872, 873 (Iowa 1999) ("The ICRA was modeled after Title VII of the United States Civil Rights Act. Iowa courts therefore traditionally turn to federal law for guidance in evaluating the ICRA."); *see also Montgomery v. John Deere & Co.*, 169 F.3d 556, 558 n.3 (8th Cir. 1999) ("[D]iscrimination claims alleged under the Iowa Civil Rights Act are analyzed in the same manner as their federal law counterparts."); *Board of Supervisors of Buchanan County v. Iowa Civil Rights Commission*, 584 N.W.2d 252, 256 (Iowa 1998) ("In deciding gender discrimination disputes, we adhere to the Title VII analytical framework[.]"). Although the Iowa Supreme Court has indicated that it will entertain arguments that the ICRA can be interpreted differently than Title VII, neither party asks the Court to do so here. *See McElroy v. State*, 703 N.W.2d 385, 391 (Iowa 2005) (declining to interpret the ICRA differently than Title VII where neither party argues for a different interpretation, but indicating that, although Iowa courts traditionally look to federal law for guidance in interpreting the ICRA, they are not bound by federal law in interpreting the ICRA). Because neither party argues that the ICRA should be interpreted differently than Title VII, the Court will analyze both King's Title VII and ICRA sex discrimination claims using federal law.

## B. Surviving Summary Judgment in a Title VII Discrimination Claim

There are two ways for an employee to survive summary judgment in a Title VII discrimination claim. *McCullough v. University of Arkansas for Medical Sciences*, 559 F.3d 855, 860 (8th Cir. 2009) (citation omitted). The first method for surviving summary judgment requires the employee to present direct evidence of discrimination. *Id.* If direct evidence is unavailable to the employee, then he or she may employ the burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), to establish an inference of unlawful discrimination. *Tenge v. Phillips Modern Ag Co.*, 446 F.3d 903, 907 (8th Cir. 2006) (citation omitted). Because King presents no direct evidence of discrimination, the Court applies the analytical framework set forth in *McDonnell Douglas* to King's claims of sex discrimination.

Under the burden-shifting analysis of *McDonnell Douglas*:

> the plaintiff first must establish a *prima facie* case of discrimination. If the plaintiff establishes a *prima facie* case, then the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for discharging the employee. If the employer meets this burden, then the employee must show that the employer's proffered reason for firing him is a pretext for unlawful discrimination. At the summary judgment stage, . . . the issue is 'whether the plaintiff has sufficient evidence that unlawful discrimination was a motivating factor in the defendant's adverse employment action.' If so, 'the presence of additional legitimate motives will not entitle the defendant to summary judgment.'

*McCullough*, 559 F.3d at 860-61 (quotations omitted).

## C. Theories of Discrimination under Title VII

In Title VII cases, a plaintiff may proceed in his or her discrimination claims under two theories, disparate treatment and disparate impact. *See Ricci v. DeStefano*, 557 U.S. 557, 577 (2009) ("Title VII prohibits both intentional discrimination (known as 'disparate treatment') as well as, in some cases, practices that are not intended to discriminate but in fact have a disproportionately adverse effect on minorities (known as 'disparate impact')."). In a disparate treatment case, an employer treats a particular individual less

9

favorably than others because of a protected trait. *See Watson v. Fort Worth Bank and Trust*, 487 U.S. 977, 985-986 (1988) (discussing the disparate treatment theory under Title VII). "A disparate treatment plaintiff must establish 'that the defendant had a discriminatory intent or motive' for taking a job related action." *Ricci*, 557 U.S. at 577 (quotation omitted).

With regard to disparate impact, in *Griggs v. Duke Power Co.*, 401 U.S. 424 (1971), the United States Supreme Court interpreted Title VII to prohibit "not only overt discrimination but also practices that are fair in form, but discriminatory in operation." *Id.* at 431. Twenty years after *Griggs*, with the enactment of the Civil Rights Act of 1991, the prohibition on disparate impact discrimination was codified. *Ricci*, 557 U.S. at 578. "Under the disparate-impact statute, a plaintiff establishes a prima facie violation by showing that an employer uses 'a particular employment practice that causes a disparate impact on the basis of . . . sex[.]'" *Id.* (quoting 42 U.S.C. § 2000e-2(k)(1)(A)(I)). King claims that "[u]nder either theory, the record supports a prima facie case of discrimination such that the Defendants' Motion for Summary Judgment should be denied[.]"[7] Accordingly, the Court will address King's claims of sex discrimination under both the disparate treatment and disparate impact theories.

### D. Sex Discrimination

#### 1. Disparate Treatment

##### a. King's Prima Facie Case

The parties do not agree on the prima facie case necessary for King's claims of sex discrimination. King directs the Court to *Bergstrom-Ek v. Best Oil Co.*, 153 F.3d 851 (8th Cir. 1998). In *Bergstrom-Ek*, the plaintiff claimed that due to her pregnancy, her manager subjected her to criticism and general workplace harassment to the point that she was forced to quit her job. *Id.* at 857. The prima facie case in such a matter requires the plaintiff to show: "'(1) she was a member of the protected group; (2) she was qualified

---

[7] King's Brief in Support of Her Resistance to Defendants' Motion for Summary Judgment (docket number 22-3) at 4.

for her position; and (3) she was discharged under circumstances giving rise to an inference of discrimination.'" *Id.* (quotation omitted). The Court is unpersuaded that this is the proper prima facie case under the facts presented in this matter. Unlike the plaintiff in *Bergstrom-Ek*, King was not constructively discharged from her position due to criticism or harassment because she was pregnant or because of her sex. Instead, King's position was eliminated and replaced with a new position which had additional job qualifications. King believes that the new qualifications were discriminatory and foreclosed the possibility that she could be hired into the new position. Under such circumstances, the Court agrees with AMHC's assertion that this case is properly evaluated in the context of a failure-to-hire or failure-to-promote case.

In order to establish a prima facie case of sex discrimination in the failure-to-promote context, King must show that: "'(1) she is a member of a protected group; (2) she was qualified and applied for a promotion to an available position; (3) she was rejected; and (4) similarly situated employees, not part of the protected group, were promoted instead.'" *Jackson v. United Parcel Service, Inc.*, 643 F.3d 1081, 1086 (8th Cir. 2011) (quoting *Shannon v. Ford Motor Co.*, 72 F.3d 678, 682 (8th Cir. 1996)); *see also Bennett v. Nucor Corp.*, 656 F.3d 802, 819-820 (8th Cir. 2011) (same); *Austin v. Minnesota Mining & Manufacturing Co.*, 193 F.3d 992, 995 (8th Cir. 1999) (same). Typically, in a failure-to-promote case, a plaintiff must show that she applied for a promotion and was rejected; however, "in cases where the very discrimination alleged would have made it futile for the plaintiff to apply for the position in question, the plaintiff's failure to apply may be excused if she can show that in the absence of such discrimination she would have applied." *Culpepper v. Vilsack*, 664 F.3d 252, 256-257 (8th Cir. 2011) (citing *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 367-386 (1977)); *see also McClure v. Career Systems Development Corp.*, 447 F.3d 1133, 1136 (8th Cir. 2006) ("[A] plaintiff who does not apply may establish a prima facie case if the employer's discriminatory practices make application futile.").

AMHC concedes that King meets the first element of her prima facie case of sex discrimination. AMHC contends, however, that King fails to establish the second, third, and fourth elements of her prima facie case. Specifically, AMHC argues that King was not qualified for the Critical Care Safety Tech position, and failed to apply for the position. AMHC also points out that "no male employee was hired for the position . . . who did not (1) possess an EMT certification, (2) pass the physical agility test, and (3) submit to an interview."[8]

King admits that she did not meet the qualifications for the new Critical Care Safety Tech position because she lacks EMT certification. However, she asserts that requiring Critical Care Safety Techs to have EMT certification is discriminatory because EMTs are predominately male. King further contends that "[r]equiring EMT certification, which is a predominantly male field coupled with the statement that Tiedt was looking for the 'bouncer type' provides a basis for a jury to conclude that women, including King, were subjected to discrimination."[9] While she does not assert that applying for the Critical Care Safety Tech position was futile, or cite to any authority for that proposition, her argument implies such.

The Court finds two difficulties with King's argument. First, King relies on statistics found in a 2008 report from the National Highway Traffic Safety Administration assessing the EMS ("Emergency Medical Services") workforce in the United States.[10] The report indicates that in 2005, twenty-nine percent of EMTs/paramedics in the United States were female. The report states that:

> Unlike many allied health professionals, EMS is heavily male-dominated. . . . However, females are highly represented

---

[8] AMHC's Corrected Memorandum of Law in Support of Their Motion for Summary Judgment (docket number 21-3) at 8-9.

[9] King's Brief in Support of her Resistance to Defendants' Motion for Summary Judgment (docket number 22-3) at 6.

[10] *See* King's Appendix (docket number 22-5) at 71-233.

> among paid EMTs/paramedics compared to other public safety
> professionals. The fire-fighter workforce is only 4 percent
> female and the patrol officer workforce is only 14 percent
> female.

King's Appendix (docket number 22-5) at 104. Interestingly, the report also provides data from a different source which states that in 2005, 38.4 percent of EMTs were female.[11] Regardless of the percentage of female EMTs in 2005, the statistics simply show that there are more male EMTs than female EMTs.

Requiring EMT certification for employees assisting other medical professionals with patients in a hospital emergency room does not lead to the conclusion that women were discriminated against during the restructuring of the Emergency Department at AMHC simply because EMTs are statistically more likely to be male than female. Moreover, two women, both with EMT certification, were hired as Critical Care Safety Techs at AMHC.[12] Even affording King all reasonable inferences--EMTs being

---

[11] *Id.* at 104-105.

[12] In her brief, King asserts that of the two women who were hired as Critical Care Safety Techs, "one, was only hired part-time and the other, although hired full-time . . . was soon pushed into a secretary position." King's Brief in Support of her Resistance to Defendants' Motion for Summary Judgment (docket number 22-3) at 7. In support of her contention, King refers the Court to paragraph eleven of her Statement of Additional Material Facts in Response to Defendants' Motion for Summary Judgment (docket number 22-2) at 3; ¶ 11. However, paragraph eleven contains no information regarding the two female employees who were hired as Critical Care Safety Techs. Paragraph eleven simply states that "[t]wo of the females with EMT certification were rehired[.]" *Id.* King neither offers any evidence, nor directs the Court to any evidence which supports her contention that the females hired were given a part-time position or "pushed" into a secretary position. Paragraph eleven simply acknowledges that two females were hired for the Critical Care Safety position. While recognizing that on a motion for summary judgment, the record must be viewed in the light most favorable to the nonmoving party and the nonmoving party must be afforded all reasonable inferences, the Court also recognizes that a nonmoving party "'may not merely point to unsupported self-serving allegations, but must substantiate [her] allegations with sufficient probative evidence[.]'" *Reed v. City of St. Charles, Mo.*, 561 F.3d 788, 790 (8th Cir. 2009) (quoting *Bass v. SBC Communications, Inc.*, 418 F.3d 870, 872-73 (8th Cir. 2005)); *see also Thomas v. Corwin*,

(continued...)

predominantly male and Tiedt stating that he was looking for the "bouncer-type"--does not negate the fact that AMHC hired two females who were both qualified for the new position. Accordingly, the Court finds that King has failed to meet the second element of her prima facie case. King was not qualified for the Critical Care Safety Tech position because she was not a certified EMT. Furthermore, King did not even apply for the new position. The fact that two qualified females were hired for the new position, shows that had King been a certified EMT, it would not have been futile for her to apply for the new position. *See Culpepper*, 664 F.3d at 256-257; *McClure*, 447 F.3d at 1136.

Additionally, the Court finds that King has also failed to meet the third and fourth elements of her prima facie case. King was not rejected for a position that she applied for, and was qualified to hold. She did not qualify and did not apply. Furthermore, all four men who were hired for the new Critical Care Safety Tech position had EMT certification. Two out of three women with EMT certification who applied were also hired for the new position.[13] Thus, one cannot say that AMHC only promoted similarly situated employees who were not part of the protected group. *See Jackson*, 643 F.3d at 1081.

Because King has failed to meet the second, third, and fourth elements of her prima facie case, the Court concludes that AMHC is entitled to summary judgment on King's

[12](...continued)
483 F.3d 516, 527 (8th Cir. 2007) ("Mere allegations, unsupported by specific facts or evidence beyond the nonmoving party's own conclusions, are insufficient to withstand a motion for summary judgment."). Because King offers no facts to support her contentions regarding the two female employees who were hired to be Critical Care Safety Techs, the Court determines that such contentions have no bearing on the outcome of this case. *See Reasonover*, 447 F.3d at 578 ("'Evidence, not contentions, avoids summary judgment.'") (quotation omitted).

[13] The parties dispute whether a third woman in the Emergency Department who had EMT certification, Cindy Boyce, would have been hired for the Critical Care Safety Tech position had she not voluntarily resigned employment with AMHC prior to Tiedt offering her the job. The Court determines that this disputed fact has no bearing on King's prima facie case. Whether Boyce would have been offered the Critical Care Safety Tech position or was offered a different position, the fact remains that two qualified females from the Emergency Department were offered the Critical Care Safety Tech position.

claim of disparate treatment sex discrimination. *See Riser v. Target Corp.*, 458 F.3d 817, 819 (8th Cir. 2006) ("'We must affirm the grant of summary judgment on a claim if any essential element of [the] prima facie case is not supported by specific facts sufficient to raise a genuine issue for trial.' *Turner v. Gonzales*, 421 F.3d 688, 694 (8th Cir. 2005).").

### b. AMHC's Legitimate Non-Discriminatory Reason

Alternatively, the Court concludes AMHC has stated a legitimate non-discriminatory reason for including the disputed qualifications. Had King met her burden of establishing a prima facie case of sex discrimination, the burden would shift to AMHC to articulate a legitimate non-discriminatory reason for failing to hire or promote her to the position of Critical Care Safety Tech. *See McCullough*, 559 F.3d at 860-61. AMHC provides the following legitimate non-discriminatory reasons for requiring Critical Care Safety Techs to have EMT certification and a pass an agility test: (1) EMT certification was implemented to ensure patient needs were satisfied, as EMTs receive training for emergency situations not provided to CNAs and LPNs; and (2) passing an agility test was implemented because Tiedt believed that the number of violent patients presenting in the Emergency Department had increased.[14] Even if King had established her prima facie case, the Court finds that AMHC articulated legitimate, non-discriminatory reasons for its decision to require Critical Care Safety Techs to possess EMT certification and pass an agility test.[15] Accordingly, the burden would shift back to King to present evidence that AMHC's proffered reasons were merely a pretext for unlawful discrimination. *Id.*

### c. Pretext

King argues that AMHC's reasons for the Critical Care Safety Tech requirements are not supported by the facts of the case. Specifically, King argues that:

---

[14] *See* AMHC's Corrected Statement of Undisputed Material Facts in Support of Their Motion for Summary Judgment (docket number 21-4) at 5; ¶¶ 20, 22.

[15] King essentially agrees that AMHC's reasons are legitimate, non-discriminatory reason, "[t]aken at face value these reasons may be non-discriminatory." King's Brief in Support of Her Resistance to Defendants' Motion for Summary Judgment (docket number 22-3) at 7.

> The first reason claimed by [AMHC] is that they needed to retain enough FTEs to provide for direct patient care. First, Tiedt offered a position of Unit Clerk to a female employee (Cindy Boyce) who had her EMT certification. Boyce was capable of providing direct patient care and yet, she was offered a position which would not allow her to perform direct patient care. Second another female was offered a part-time position as a Critical Care Safety Tech and the third female, who was offered a full-time position as a Critical Care Safety Tech was soon forced into an acute care coordinator position, which is a secretarial position. These facts are not consistent with retaining employees with the ability and/or certification to provide direct patient care.

King's Brief in Support of Her Resistance to Defendants' Motion for Summary Judgment (docket number 22-3) at 8. As to AMHC's reasoning regarding the requirement of an agility test for the Critical Care Safety position, King asserts that:

> Mike Tiedt's testimony is the only evidence in the record that violence was increasing. [AMHC] has provided no other records or documentation to support their claim that violence was increasing. To the contrary, two former employees, King and Boyce, do not recall any significant increase in violence in the emergency room prior to November 2009.

*Id.* King concludes that AMHC "offers two reasons, which it claims are non-discriminatory reasons for reorganization; however, the material facts are in dispute as to whether these reasons are pre-textual."[16]

In order to show pretext, King must present "evidence raising a reasonable inference that [the employer's] legitimate non-discriminatory reason was in fact a pretext for intentional sex discrimination." *Crone v. United Parcel Service, Inc.*, 301 F.3d 942, 944 (8th Cir. 2002). In *Torgerson v. City of Rochester*, 643 F.3d 1031 (8th Cir. 2011), the Eighth Circuit Court of Appeals explained that there are two ways for a plaintiff to demonstrate a fact question regarding pretext:

---

[16] King's Brief in Support of Her Resistance to Defendants' Motion for Summary Judgment (docket number 22-3) at 8.

> A plaintiff may show that the employer's explanation is 'unworthy of credence . . . because it has no basis in fact.' Alternatively, a plaintiff may show pretext 'by persuading the court that a prohibited reason more likely motivated the employer.' Either route amounts to showing that a prohibited reason, rather than the employer's stated reason, actually motivated the employer's action.

*Id.* at 1047 (quotations omitted). King offers no authority on the issue of pretext, and little indication of how pretext should be established in this case. Instead, King simply states that the facts in this case "are not consistent with retaining employees with the ability and/or certification to provide direct patient care" because Boyce was offered a Unit Clerk position instead of the Critical Care Safety Tech position and the two females hired as Critical Care Safety Techs were part-time or "pushed" into other positions.[17] As discussed in footnote 12, King offers no evidence to support her contention that the females hired to the Critical Care Safety Tech position were hired as part-time or "pushed" into a secretary position. King refers to paragraph eleven of her Statement of Additional Material Facts in Response to Defendants' Motion for Summary Judgment, but that paragraph simply acknowledges that two females were hired for the Critical Care Safety position. It is unclear to the Court how these facts, even if true, constitute evidence "raising a reasonable inference that [the employer's] legitimate non-discriminatory reason was in fact a pretext for intentional sex discrimination." *Crone*, 301 F.3d at 944. As discussed earlier, whether Boyce would have been offered the Critical Care Safety Tech position as asserted by AMHC, or was offered a different position as asserted by Boyce, the fact remains that two qualified females from the Emergency Department were offered the Critical Care Safety Tech position. Ultimately, two out of three EMT certified females in the Emergency Department were hired as Critical Care Safety Techs. Therefore, the Court determines that King has failed to show that the EMT certification requirement for

---

[17] King's Brief in Support of Her Resistance to Defendants' Motion for Summary Judgment (docket number 22-3) at 8.

the Critical Care Safety Tech position was pretext for intentional sex discrimination. *See id.*

Similarly, King questions AMHC's assertion that the agility test was necessary due to an escalation of violence in the Emergency Department. King states that neither she, nor Boyce noticed an escalation of violence prior to the reorganization of the Emergency Department in November 2009. Again, it unclear to the Court how these facts, even if true, constitute evidence "raising a reasonable inference that [the employer's] legitimate non-discriminatory reason was in fact a pretext for intentional sex discrimination." *Crone*, 301 F.3d at 944. Furthermore, it is unclear whether King actually believed there was no escalation of violence in the Emergency Department. In her Statement of Additional Material Facts in Response to Defendants' Motion for Summary Judgment, King indicates that she "might have noticed an increase in violence, but she did not know if it would have been significant."[18]

The Court is mindful that employers are free to make employment decisions, based on mistaken beliefs, and "courts do not sit as 'super personnel departments reviewing the wisdom or fairness of the business judgments made by employers, except to the extent that those judgments involve intentional discrimination.'" *Edmund v. MidAmerican Energy Co.*, 299 F.3d 679, 685-86 (8th Cir. 2002) (quotation omitted). Most significantly, two out of three EMT certified females in the Emergency Department, who also passed the agility test, were hired as Critical Care Safety Techs. Therefore, the Court determines that King has failed to show that the agility test requirement for the Critical Care Safety Tech position was pretext for intentional sex discrimination. *See id.*

In summary, because King has failed to show that AMHC's requirements for the Critical Care Safety Tech position were pretext for intentional sex discrimination, the Court concludes that even if King had met the requirements of her prima facie case,

---

[18] King's Statement of Additional Material Facts in Response to Defendants' Motion for Summary Judgment (docket number 22-2) at 2; ¶ 6.

AMHC would still be entitled to summary judgment on King's disparate treatment sex discrimination claim. *See McCullough*, 559 F.3d at 860-61.

### 2. *Disparate Impact*

King also argues that the requirements of EMT certification and passing an agility test for the Critical Care Safety Tech position disparately impacted the ability of women to get hired for the new position. King asserts that:

> No males employed by Allen Emergency Room lost their jobs due to the reorganization which occurred around December 2009. More women worked in the position of Critical Care Tech prior to the reorganization than worked in the position of Critical Care Safety Tech after the reorganization in the Allen Emergency Room. Prior to the reorganization, seventeen women and four men were employed in the positions of Acute Care Coordinator and Critical Care Tech. After the reorganization, only seven women remained, but all four men were rehired as to these two positions.[19]

King's Brief in Support of Her Resistance to Defendants' Motion for Summary Judgment (docket number 22-3) at 10-11. King also re-asserts her argument regarding Boyce being offered a Unit Clerk position instead of the Critical Care Safety Tech position, and the two females hired as Critical Care Safety Techs being part-time or "pushed" into other

---

[19] In order to properly understand King's assertion, the Court believes that some clarification is in order. Prior to the reorganization of the Emergency Department in 2009, there were 10 Acute Care Coordinators, all women, and after the reorganization, the position was reduced from 10 employees to 7, but all 7 Acute Care Coordinators remained women. It is unclear from the record, but assuming there were 21 total employees (17 women and 4 men), subtracting 10 Acute Care Coordinators would leave 11 employees in the Critical Care Tech position (4 men and 7 women). Of these eleven employees it appears that 7 were certified EMTs (4 men and 3 women). All 4 men and 2 of the 3 women were hired for 6 new Critical Care Safety Tech positions. This leaves 9 women and 4 men in the Emergency Department in the positions of Acute Care Coordinator and Critical Care Safety Tech. *See* Defendants' Response to Plaintiff's Statement of Additional Material Facts in Response to Defendants' Motion for Summary Judgment (docket number 24) at 7-9, 11-12; ¶¶ 7, 12.

positions as evidence of disparate impact on the ability of women to be hired for the position of Critical Care Safety Tech.[20] King concludes that:

> There is a direct causal connection between the facially neutral employment policy or practice -- the reorganization of the emergency room and requiring Critical Care Safety Techs to have EMT certification and pass a physical agility test -- and the end result -- that without exception, all men remained in the employment of Allen Hospital and ten women, including King, did not.[21]

King's Brief in Support of Her Resistance to Defendants' Motion for Summary Judgment (docket number 22-3) at 11.

In *Ricci*, the United States Supreme Court explained that under the disparate impact statute, a plaintiff establishes "a prima facie violation by showing that an employer uses 'a particular employment practice that causes a disparate impact on the basis of . . . sex[.]'" 557 U.S. at 578 (quoting 42 U.S.C. § 2000e-2(k)(1)(A)(I)). In other words, a plaintiff establishes a prima facie case of disparate impact under Title VII, by showing: "'(1) an identifiable, facially-neutral personnel policy or practice; (2) a disparate effect on members of a protected class; and (3) a causal connection between the two.'" *Bennett*, 656 F.3d at 817 (quotation omitted). "An employer may defend against liability by demonstrating that the practice is 'job related for the position in question and consistent with business necessity.'" *Ricci*, 557 U.S. at 578 (quoting 42 U.S.C. § 2000e-2(k)(1)(A)(I)). However, even if the employer meets its burden, a plaintiff "may still succeed by showing that the employer refuses to adopt an available alternative employment practice that has less disparate impact and serves the employer's legitimate needs." *Id.* (quoting 42 U.S.C. § 2000e-2(k)(1)(A)(ii) and (C)).

---

[20] *See* King's Brief in Support of Her Resistance to Defendants' Motion for Summary Judgment (docket number 22-3) at 11.

[21] Again, it is not clear from the record, but the numbers appear to be that 13 out 21 employees retained their positions after the 2009 reorganization, including 9 women and 4 men. Thus, King's assertion that 10 women lost their jobs appears incorrect. The correct number appears to be 8.

King is unable to establish a prima facie case of disparate impact. The facially-neutral policy of requiring Critical Care Safety Techs to have EMT certification and pass an agility test did not have disparate impact on women. As discussed in section *V.D.1*, the Court determined that AMHC had legitimate non-discriminatory reasons for the Critical Care Safety Tech requirements it imposed upon creating the position. The Court also determined that the requirements were not pretext for sex discrimination. The facts in this case show that seven individuals in the Emergency Department at the time of the department reorganization in 2009, had their EMT certification. Four of these individuals were men and three were women. AMHC hired six individuals for this position, including two women. It is clear that AMHC's policies with regard to the requirements for the Critical Care Safety Tech position did not have a disparate impact on qualified female applicants. Moreover, focusing solely on King, she lacked EMT certification; and therefore, was not qualified for the position and was not disparately impacted by AMHC's policies. Additionally, the Court finds that AMHC had legitimate business reasons for imposing the EMT and agility test requirements.[22] Lastly, King has offered nothing with regard to an alternative employment practice that would have a less disparate impact and serve AMHC's legitimate needs. *See Ricci*, 557 U.S. at 578. Accordingly, the Court determines that AMHC is entitled to summary judgment on King's disparate impact claim.

## VI. CONCLUSION

The Court concludes that AMHC is entitled to summary judgment on both of King's sex discrimination claims. AMHC has shown that there is no genuine dispute as to any material fact on King's disparate treatment and disparate impact sex discrimination claims and it is, therefore, entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). Thus, AMHC's motion for summary judgment is granted.

---

[22] *See* AMHC's Corrected Statement of Undisputed Material Facts in Support of Their Motion for Summary Judgment (docket number 21-4) at 5; ¶¶ 20, 22.

## VII. ORDER

**IT IS THEREFORE ORDERED AS FOLLOWS:**

1.     The Corrected Motion for Summary Judgment (docket number 21) filed by Defendants Allen Memorial Hospital Corporation, d/b/a Allen Memorial Hospital, Allen Health Systems, and Iowa Health Systems on November 21, 2012, is hereby **GRANTED**.

2.     The Amended Complaint and Jury Demand (docket number 4) filed by Plaintiff Melody King on September 30, 2011, is hereby **DISMISSED**.

3.     The trial scheduled on March 11, 2013 and the final pretrial conference set for February 15, 2013 are hereby **CANCELLED**.

4.     This case is **CLOSED**.

DATED this 26ᵗʰ day of _December_, 2012.

JON STUART SCOLES
CHIEF MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA